307 Ga. 722
FINAL COPY

S19A1302.  REDDING v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Kerri Redding was convicted of malice murder and other crimes in connection with the shooting death of Christopher Kenyatta. Appellant contends that his trial counsel provided ineffective assistance by failing to raise the possible biases of two witnesses and by failing to object to certain testimony from the lead detective. Appellant also claims that the trial court erred by not allowing him to impeach an out-of-court declarant with a certified copy of the declarant's conviction. We see no reversible error, so we affirm.[1]

---

[1] Kenyatta was killed on July 6, 2016. On March 28, 2017, a DeKalb County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. His trial began on December 4, 2017, and on December 8, the jury found him guilty of all charges. On December 12, the trial court sentenced Appellant to serve life in prison for malice murder and five consecutive years for the firearm offense. The felony murder count was vacated by operation of law, and the aggravated assault count merged. Appellant filed a timely motion for new trial, which he later amended through new counsel. After an evidentiary

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In the spring of 2016, Kenyatta lived in an apartment with his girlfriend Michelle Alamonord. Appellant and his friend Christopher Gaskins often stayed in an apartment next door. Kenyatta and Appellant were friends, although they began getting into arguments as summer approached.

The first argument arose when Appellant refused to pay Kenyatta $20 that Appellant owed him. Kenyatta asked Appellant for the money on several occasions, which angered Appellant. In early June, Appellant and Kenyatta argued again after Kenyatta drank two of Appellant's beers, but refused to pay Appellant for the entire six-pack. Appellant became so mad that he threatened to get his gun.[2] That night, Appellant told Derek White, a drug dealer who also lived in the apartment complex, that Kenyatta planned to rob

hearing, the trial court denied the motion on December 17, 2018. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the August 2019 term and submitted for decision on the briefs.

[2] Several witnesses later testified that Appellant often carried a .22-caliber handgun in his pocket.

2

and beat up White. According to Alamonord, Appellant and Kenyatta had actually planned to rob and beat up White together, and Appellant told White that Kenyatta alone made the plan to get back at Kenyatta after their argument about the beer.

A few days before the murder, Appellant told Alamonord that Kenyatta had cheated on her. Appellant also said, "F**k Chris [Kenyatta], I don't like him." Alamonord asked Kenyatta about his cheating, and he responded, "I know exactly who told you that." Two days later, Kenyatta confronted Appellant; they argued and Kenyatta told Appellant, "if you want to fight, we can fight or else since you have that little gun, you can go ahead and use it."

On the night of July 5-6, 2016, Kenyatta was hanging out with his friend Justin King, Appellant, Gaskins, and a few other people at the apartment where Appellant and Gaskins stayed. According to King, around 2:30 or 2:45 a.m., Kenyatta told King, Appellant, and Gaskins that he was going to the store to buy some cigarettes and snacks, and King asked Kenyatta to buy him some chips and a drink; King gave Kenyatta his credit card and Kenyatta left; and Appellant

and Gaskins left the apartment five to ten minutes later.

Around 8:00 a.m., a police officer responded to a 911 call reporting a body lying on a trail through the woods between the apartment complex and a nearby convenience store. The officer found Kenyatta, who had died from multiple gunshot wounds, lying face up on the trail. He had King's credit card, and a bag that contained chips and a drink was beside him on the ground.

That night, Appellant and Gaskins went to Gaskins's sister Shannon Johnson's house, where they also sometimes stayed. Appellant smirked as he told Johnson that "it was messed up how they did [Kenyatta]." The next morning, Appellant left Johnson's house; he did not take with him most of the belongings that he usually kept at the house, and Gaskins and Johnson did not see Appellant after that.

Detectives interviewed Gaskins on July 17, December 11, December 16, and December 20, 2016. During the first three interviews, Gaskins said that Kenyatta left Gaskins and Appellant's apartment in the early morning hours on July 6; that Appellant,

4

Gaskins, and Gaskins's girlfriend also left; that Gaskins's girlfriend gave Appellant a ride to his grandmother's apartment, which was in the same complex; and that the girlfriend then dropped off Gaskins at Johnson's house. Gaskins's final interview on December 20 was audio recorded and later played for the jury; during that interview, Gaskins admitted that Appellant had returned to their apartment sometime later on the morning of the shooting and told Gaskins that Appellant got into a struggle with Kenyatta "in the cut" and shot him.[3] After the interview, the police charged Gaskins with making false statements. Later that day, police obtained an arrest warrant for Appellant, and three days later, he was arrested at an apartment complex in Auburn, Alabama.

At trial, Gaskins recanted his December 20 statement and claimed that the story he told in his first three interviews was true. Johnson also testified for the State; she said that at some point after Kenyatta's murder, Gaskins told her that Appellant killed

---

[3] A detective testified that "the cut" referred to the trail through the woods where Kenyatta's body was found.

5

Kenyatta. Gaskins also told her that blood got on Appellant's clothing when Kenyatta was shot.[4] In addition, a friend of Johnson testified that Johnson told her that Appellant and Gaskins came to Johnson's house shortly after the shooting and that their clothes were bloody. According to the friend, either Johnson, Appellant, or Gaskins disposed of the bloody clothes.[5]

The medical examiner who performed Kenyatta's autopsy testified that Kenyatta was shot five times — once each in the hand, chest, abdomen, back, and neck. The medical examiner removed four .22-caliber bullets from Kenyatta's body and testified that the location of the bullet wound on Kenyatta's hand was consistent with his defending himself against an attack. A firearms examiner testified that all four bullets were fired from the same .22-caliber gun and explained that various kinds of .22-caliber guns could have

---

[4] Johnson claimed that Gaskins's statements were based on things he had heard in the neighborhood, not his direct knowledge. Gaskins also testified that he told Johnson that Appellant killed Kenyatta because he assumed it, "based off of [their] verbal disagreement[s]."

[5] Johnson testified that she did not see Appellant or Gaskins wearing bloody clothes, did not help dispose of the clothes, and did not tell her friend that she disposed of the clothes.

fired the bullets, including a Mossburg .22 rifle, a Savage .22 Magnum rifle, a Rome .22 revolver, or a North American Arms .22 Magnum revolver. Because there were no shell casings at the scene of the crime and revolvers do not eject casings, detectives concluded that the gun was most likely either a Rome or a North American Arms revolver. The State presented evidence that in September 2015, Clayton County sheriff's officers confiscated a North American Arms .22 Magnum revolver from Appellant during a traffic stop. The gun was returned to Appellant in April 2016, about three months before Kenyatta's murder.

Appellant did not testify. His defense theory was that the apartment complex and trail where Kenyatta was shot were in a high-crime area and that someone else shot him. To support that theory, Appellant pointed to a tip to investigators from a woman who lived near the trail; the woman said that she heard gunshots and female voices around the time Kenyatta was killed. Appellant also argued that White, after learning from Appellant that Kenyatta planned to rob him, could have killed Kenyatta.

7

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Green v. State*, 304 Ga. 385, 387-388 (818 SE2d 535) (2018) ("'It is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient.'" (citation omitted)).

2. Appellant contends that his trial counsel provided ineffective assistance in two ways. To prevail on these claims, Appellant must prove both that his counsel's performance was professionally deficient and that he was prejudiced as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984).

To establish deficient performance, Appellant must show that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690.

> This is no easy showing, as the law recognizes a "strong presumption" that counsel performed reasonably, and Appellant bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course."

*Brown v. State*, 302 Ga. 454, 457 (807 SE2d 369) (2017) (citations omitted). To prove prejudice, Appellant must demonstrate a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. We need not address both parts of the *Strickland* test if Appellant makes an insufficient showing on one. See id. at 697.

(a) Appellant first claims that his trial counsel provided ineffective assistance by failing to adequately cross-examine King and Gaskins about their possible biases in testifying for the State.

9

Appellant argues that his counsel should have questioned those two witnesses about the possible prison sentences they were facing in connection with criminal charges brought before they testified. But Appellant has not proved that his trial counsel performed deficiently.

On direct examination, King testified that he was charged with burglary in 2015; that he pled guilty to that crime under the First Offender Act in early 2017; and that he was on probation at the time of trial. Appellant's counsel began cross-examination of King by referencing his probation and asking if there were warrants for his arrest and if he was aware that he was being taken into custody. King replied that there had been a "misunderstanding" with his probation officer but that everything "should be worked out." Counsel again asked King if he had been taken into custody just before he testified, and King answered, "Right." Counsel then moved on to other questions.

Appellant now asserts that his trial counsel should have asked King about the 20-year maximum sentence he could have received

for burglary, because that charge was pending when the police interviewed him about Kenyatta's murder and because he may have been facing a revocation of his first-offender probation when he testified. Appellant has not shown, however, that King had any sort of plea deal with the State — on the burglary charge or the potential probation violation — in exchange for his statement to the police or his testimony at trial. Thus, the trial court could have prohibited Appellant's trial counsel from cross-examining King about his possible sentence. See, e.g., *Smith v. State*, 300 Ga. 538, 541-542 (796 SE2d 666) (2017) (holding that the trial court did not abuse its discretion by prohibiting trial counsel from cross-examining the defendant's co-indictee about his potential life sentence for murder, because he had not obtained a concrete plea deal from the State in exchange for his testimony). Because Appellant has not established that the trial court would have allowed his counsel to question King about his possible sentence, he has not established that counsel performed deficiently by failing to ask those questions. See *Flannigan v. State*, 305 Ga. 57, 61-62 (823 SE2d 743) (2019)

11

(concluding that trial counsel did not perform deficiently by failing to cross-examine the defendant's co-indictee about the possible life sentences he faced, as the trial court could have exercised its discretion to prohibit counsel from asking those questions because the co-indictee did not have a concrete plea deal with the State in exchange for his testimony).

Moreover, trial counsel elicited King's testimony that King had been arrested for a possible probation violation and also attempted to cast doubt on King's credibility by suggesting that he had been using drugs on the night of the murder and by emphasizing that King had been close with Kenyatta but not with Appellant. Trial counsel's decision to forgo cross-examining King about his possible prison sentence — a line of questioning that the trial court could have prohibited — and to instead challenge King's credibility in other ways was a reasonable strategy. See, e.g., *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013) (explaining that "'[t]he extent of cross-examination is a strategic and tactical decision'" (citation omitted)). Counsel's performance was not deficient in this respect,

and Appellant cannot prevail on this claim.

Appellant similarly argues that his trial counsel should have cross-examined Gaskins about the possible prison sentence he faced in connection with his charge of making false statements to the police during his interviews about the murder. See OCGA § 16-10-20 (establishing a sentence of one to five years in prison for making a false statement). As with his claim related to King, Appellant has not shown that Gaskins had a plea deal with the State in exchange for his testimony, so he cannot demonstrate that the trial court would have allowed Appellant's counsel to question Gaskins about the possible sentence he faced if convicted of the pending charge. See *Flannigan*, 305 Ga. at 61-62.

In addition, trial counsel's decision not to question Gaskins about his possible sentence was reasonable, because the bulk of his testimony was favorable to Appellant. See *Gibson v. State*, 272 Ga. 801, 804 (537 SE2d 72) (2000) (concluding that trial counsel did not perform deficiently by failing to object to testimony that benefitted the defense). On cross-examination, counsel emphasized that during

Gaskins's first three police interviews, he did not implicate Appellant in the murder. Only during the fourth interview did Gaskins assert that Appellant had said that he shot Kenyatta, and counsel elicited Gaskins's testimony that his fourth interview statement was not true and that he accused Appellant only because the police threatened Gaskins and his sister with criminal charges. Counsel also questioned Gaskins about the false statements charge, and Gaskins testified that the police charged him with that crime because of a mere "discrepancy," as Gaskins told them in one interview that he and Appellant left the apartment around the same time as Kenyatta but claimed in a later interview that he and Appellant left about 30 minutes later. Trial counsel's decision not to undermine testimony that largely benefitted Appellant with questions that the trial court could have disallowed was an entirely reasonable strategy. Thus, Appellant has not shown that his counsel performed deficiently with regard to this claim either.

(b) Appellant next contends that his trial counsel provided ineffective assistance by failing to object to testimony from the lead

14

detective on the case about Appellant's flight from the police. After the State presented evidence that Appellant was arrested at an apartment complex in Auburn, Alabama nearly six months after the murder, the prosecutor asked the detective if "evidence of flight in homicide cases" is "significant in investigations." The detective answered yes, and when the prosecutor asked why, he replied, "Usually when a suspect is trying to avoid prosecution."

Appellant concedes in his brief that evidence of a defendant's flight from the police is "generally admissible as circumstantial evidence of guilt." *Rowland v. State*, 306 Ga. 59, 65 n.4 (829 SE2d 81) (2019). He argues, however, that his trial counsel should have objected to the detective's testimony because it was improper for a witness to tell the jury that flight indicates guilt. But Appellant's counsel did not perform deficiently by deciding not to object, even if an objection might have been made and sustained.

To begin with, neither the prosecutor's questions nor the detective's answers spoke in terms of guilt. Instead, the detective simply expressed the truism that evidence of a homicide defendant's

15

"flight" usually indicates that he is "trying to avoid prosecution." But even if "trying to avoid prosecution" is understood as implying consciousness of guilt, "'any rational juror would have guessed that (the detective) believed as much without being told.'" *Thompson v. State*, 304 Ga. 146, 153 (816 SE2d 646) (2018) (citation omitted). Thus, the detective's comment did not cause Appellant significant prejudice. See id. ("'[S]uch comments upon the patently obvious generally pose little, if any, danger of prejudice.'" (citation omitted)).

Moreover, trial counsel's decision not to object to these brief and unremarkable comments was strategic. On cross-examination, counsel elicited the detective's admission that he did not know when Appellant had moved to Alabama or if Appellant's name was on the lease for the apartment there. Counsel referenced the detective's earlier statement about flight to point out that Appellant could have moved to Alabama on the day after the murder or shortly before he was arrested almost six months later, and the detective then acknowledged that he was not aware of any evidence, other than Appellant's being in Alabama when he was arrested, that showed he

16

fled rather than simply moved away. During closing argument, Appellant's counsel again emphasized that the evidence did not show that Appellant fled.

Trial counsel's decision not to object to the detective's testimony but rather to undermine it through cross-examination and closing argument was reasonable. See *Faust v. State*, 302 Ga. 211, 219 (805 SE2d 826) (2017) ("Whether to object during direct examination or instead rely on cross-examination 'falls within the ambit of reasonable trial strategy.'" (citation omitted)); *Lupoe v. State*, 284 Ga. 576, 578 (669 SE2d 133) (2008) (concluding that trial counsel's decision not to object to a witness's reading aloud from his statement to the police was strategic, because during cross-examination counsel used portions of the statement to undermine the witness's testimony). For these reasons, Appellant cannot succeed on this ineffective assistance claim.

3. As mentioned in Division 1 above, Appellant argued at trial that a neighborhood drug dealer, Derek White, could have committed the murder after being told by Appellant that Kenyatta

17

planned to rob him. Appellant now contends that the trial court erred by prohibiting him from impeaching White, who did not testify at trial, with a certified copy of his 2007 conviction in New York for second-degree criminal possession of a weapon. We disagree.

At trial, the lead detective testified that he interviewed White after the murder and that White said that Kenyatta told White that Appellant planned to rob and possibly kill White. (As discussed above, Kenyatta's girlfriend Alamonord testified that *Appellant* told White that *Kenyatta* planned to rob and beat up White.) Appellant's counsel asked the trial court's permission to impeach White's out-of-court statement to the detective with a certified copy of White's prior conviction. See OCGA § 24-8-806 ("When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if the declarant had testified as a witness. . . ."); *Hawkins v. State*, 350 Ga. App. 862, 872-873 (830 SE2d 301) (2019). The court denied the request.

Assuming without deciding that the trial court's exclusion of

the certified conviction was an abuse of discretion, it was harmless. "'The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.'" *Winters v. State*, 305 Ga. 226, 229 (824 SE2d 306) (2019) (citation omitted). Appellant's counsel was permitted to elicit the detective's testimony that during the interview with White, White admitted serving five-and-a-half years in prison in New York on a weapons charge, so showing the jury a copy of that conviction would have been essentially cumulative. In addition, the detective testified that White was a drug dealer; that he admitted being at the apartment complex near the time of the murder; and that the detective nevertheless failed to investigate him as a suspect. Under these circumstances, it is highly probable that the outcome of the trial would not have been different if the trial court had admitted the copy of White's conviction. See, e.g., id. (concluding that any error in the trial court's failure to admit a section of a GBI report to impeach a witness's credibility was harmless, given other evidence that "placed the question of her credibility . . . squarely before the

19

jury without the need for [the excluded evidence]").

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 27, 2020.
Murder. DeKalb Superior Court. Before Judge Flake.
*Zell & Zell, Rodney S. Zell*, for appellant.
*Sherry Boston, District Attorney, Emily K. Richardson, Deborah D. Wellborn, Vincent J. Faucette, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior*

*Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.