310 Ga. 658
FINAL COPY

S20A1134.  MARTIN v. THE STATE.
S20A1135. BYRD v. THE STATE.

MELTON, Chief Justice.

In these related appeals, Dreshaun Martin and Tori Byrd appeal their convictions for the malice murder of Valentine Dwight Gant, Jr., and the aggravated assault of Gant's three-year-old son.[1] For the reasons set forth below, we affirm in both cases.

1. In the light most favorable to the verdicts, the evidence

---

[1] Martin and Byrd were indicted in Chatham County on September 21, 2016. Both men were charged with one count of malice murder, one count of felony murder, and two counts of aggravated assault (one for each victim). At a jury trial from May 21 to May 24, 2018, Martin and Byrd were found guilty of all counts. The trial court sentenced each defendant to life in prison for the malice murder of Gant with 20 consecutive years for the aggravated assault of Gant's son. The felony murder count against each defendant was vacated by operation of law, see *Malcolm v. State*, 263 Ga. 369, 371 (4) (434 SE2d 479) (1993), and the count of aggravated assault involving Gant was merged into the malice murder count for purposes of sentencing.

On June 4, 2018, Martin filed a motion for new trial, and he amended it on December 19, 2019. Byrd filed a motion for new trial on June 5, 2018, and he amended his motion on May 17, 2019 and June 27, 2019. Following a hearing held on October 7, 2019, the trial court denied Martin's motion on February 26, 2020 and denied February 27, 2020. Thereafter, both Martin and Byrd filed timely notices of appeal, and their cases, submitted for decision on the briefs, were docketed to the August 2020 term of this Court and consolidated for review.

produced at trial shows that on June 6, 2015, Byrd, Martin, and Justin Cassell were socializing with several others in the back yard of Jasmine Brown, the mother of Byrd's child. The three men wanted some marijuana, but they had no money. At that point, they discussed the possibility of "finessing" people for marijuana, i.e., tricking or robbing them. Ebony Young, Cassell's friend, overheard some of this planning, though she left the back yard while the planning was ongoing. She testified that she did not want to stay there because she believed that the men were going to behave badly.

Martin, Byrd, and Cassell eventually decided that Byrd would call Gant, a marijuana dealer whom Byrd knew and thought would come to them, as Gant was in the Edgewater Apartment complex which was adjacent to Brown's back yard and accessible through a hole in her back fence. At Byrd's request, Gant agreed to come through the Edgewater Apartment complex and meet the men. When Gant answered Byrd's phone call, Gant's girlfriend, who was with him at the time, saw the name "Tori" come up on Gant's phone. Before Gant left, his son asked to go with him, which Gant allowed.

2

While Martin, Byrd, and Cassell waited, they planned to steal both Gant's marijuana as well as any money Gant might be carrying. They discussed fighting Gant for the drugs and money, but decided to approach him with a gun that Byrd had brought and subsequently handed to Martin. It was agreed that Byrd would take all of Gant's marijuana, and Martin and Cassell would split any money they stole.

Justin Gibson, who was outside the apartments on the other side of the fence, could hear much of this conversation about robbing Gant. Martin, Byrd, and Cassell knew Gibson was there, but they were not particularly concerned about his presence and did not attempt to hide their conversation or actions from him, as they knew that Gibson suffered from intellectual disabilities.

A short time later, Gant arrived in his car and pulled into a parking lot where the three men could see him from Brown's house. Gibson testified that he saw Martin and Cassell approach Gant from the rear of the car. Byrd had gone into Brown's house. On the way to Gant's car, Martin handed the gun to Cassell, who approached

the driver's door and pointed the gun at Gant's head. Gant tried to fight Cassell for the weapon. In the tussle, Cassell shot Gant in the chest. The bullet traveled down Gant's body and out his back, going into and then out of the leg of Gant's son, who was sitting next to Gant in the vehicle. Cassell and Martin then ran away.[2]

Fatally wounded, Gant briefly drove out of the Edgewood Apartment complex and into the parking lot of another complex across the street, where his sister lived. Gant subsequently died from the gunshot wound, but his son survived. Gibson followed Gant's vehicle on foot and made contact with police, telling them what he had seen that afternoon. A bullet was later recovered from Gant's vehicle and determined to be consistent with having been fired by a Smith and Wesson .9mm handgun.

Initially, only Cassell was identified and charged with Gant's murder. Cassell proceeded to a jury trial, but, mid-trial on August 9, 2016, Cassell agreed to plead guilty to voluntary manslaughter.

---

[2] The men were apparently unsuccessful in robbing Gant, as a bag of marijuana was later found in Gant's car.

In return, Cassell provided the State with a full version of the events leading up to the shooting in a recorded interview (which was later introduced at the trial of Martin and Byrd). Martin and Byrd were arrested the next day, and later indicted and tried on the evidence set forth above.

Despite contentions otherwise, this evidence was sufficient as a matter of constitutional due process to enable the jury to find both Martin and Byrd guilty beyond a reasonable doubt of the crimes of which they were convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); *Butts v. State*, 297 Ga. 766, 770 (2) (778 SE2d 205) (2015) (jury may infer common criminal intent from defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes); *Cargill v. State*, 256 Ga. 252, 253 (1) (347 SE2d 559) (1986) (as to the guilt of a party to a crime for co-perpetrator's acts, "[t]he act of one [perpetrator] was the act of the other in the commission of [the crimes]" (Citation and punctuation omitted.)).

Neither Martin's contention that Cassell's testimony was not sufficiently corroborated nor Byrd's contention that the child's shooting was unforeseeable has merit. With regard to Martin's corroboration claim, it is true that Cassell's testimony must be corroborated because he was an accomplice of Martin and Byrd. See OCGA § 24-14-8.[3] There was, however, ample corroboration from multiple witnesses, including the testimony of Gibson and Young that recounted the planning and execution of the crimes. See *Dozier v. State*, 307 Ga. 583, 586 (837 SE2d 294) (2019) (noting that "[s]ufficient corroborating evidence may be circumstantial, it may be

---

[3] OCGA § 24-14-8 provides:

The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

Although Georgia mandates this corroboration by statute, we note that federal constitutional due process does not have such a requirement. See, e.g., *State v. Grier*, 309 Ga. 452, 455-456 (2) (847 SE2d 313) (2020) (concluding that evidence was sufficient to sustain convictions as a matter of federal constitutional due process under *Jackson v. Virginia*, supra, "regardless" of whether evidence showed that State's witness was an accomplice, before considering whether evidence was sufficient under state law, specifically OCGA § 24-14-8).

6

slight, and it need not of itself be sufficient to warrant a conviction of the crime charged," but it "must be independent of the accomplice testimony and must directly connect the defendant with the crime or lead to the inference that he is guilty") (citation and punctuation omitted). See also *Crawford v. State*, 294 Ga. 898, 901 (1) (757 SE2d 102) (2014) ("Once the State adduces [corroborating] evidence, it is peculiarly a matter for the jury to determine whether the evidence sufficiently corroborates the accomplice's testimony and warrants a conviction." (Citation and punctuation omitted.)).

Byrd's argument that the presence and shooting of Gant's son was an unforeseeable collateral consequence is equally meritless.

> It has long been the law of Georgia that "[a]ll of the participants in a conspiracy are criminally responsible for the acts of each, committed in the execution of the conspiracy, and which may be said to be a probable consequence of the conspiracy, even though the particular act may not actually have been part of the plan." *Huffman v. State*, 257 Ga. 390, 391 (2) (359 SE2d 910) (1987). This criminal responsibility also applies to collateral acts of a co-conspirator, so long as such collateral acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy. See *Everritt v. State*, 277 Ga. 457, 459 (588 SE2d 691) (2003) (quoting *Pinkerton v. United States*, 328 U. S. 640, 647-648 (66 SCt 1180, 90 LE

7

1489) (1946)). . . . "Even if [Byrd] did not have the specific intent that [Gant's son] be [shot], the crimes which [he] did intend were dangerous ones; by their attendant circumstances, they created a foreseeable risk of death." *Parks v. State*, 272 Ga. 353, 354 (529 SE2d 127) (2000).

*McLeod v. State*, 297 Ga. 99, 102 (1) (772 SE2d 641) (2015). The defendants planned an armed robbery as part of an illegal drug transaction. It was not an unforeseeable collateral consequence that someone might get shot during the commission of such an obviously dangerous and illegal enterprise. See id. See also *Robinson v. State*, 298 Ga. 455, 457-459 (1) (782 SE2d 657) (2016) (holding that the fatal shooting of the defendant's accomplice by the victim during an attempted armed robbery was foreseeable); *State v. Jackson*, 287 Ga. 646, 654 (3) (697 SE2d 757) (2010) ("Proximate causation imposes liability for the reasonably foreseeable results of criminal . . . conduct if there is no sufficient, independent, and unforeseen intervening cause.").

2. Both Martin and Byrd contend that the trial court erred by denying a motion for mistrial after the State failed to properly redact a small portion of Cassell's recorded statement. We disagree.

8

In one part of his recorded interview, Cassell told the questioning investigator that Gibson had not visited Brown's back yard while Cassell was present. The investigator then inquired how Gibson could have known about the robbery if he had not been in or near Brown's back yard. In response, Cassell stated an assumption that, if Gibson had been present, Gibson must have visited the back yard prior to Cassell's arrival. At a pretrial hearing, the trial court ruled that this portion of Cassell's interview should be redacted because it was based on speculation. At trial, however, it was accidentally played for the jury.

After the unexpected portion of Cassell's statement was played, Byrd moved for a mistrial, which Martin joined. In response, the State recognized its mistake and requested that the trial court issue a curative instruction. The trial court denied the motions for mistrial, but granted the State's request and instructed the jury: "I want you to disregard the last statement by the witness in the audio tape, which is speculative in nature. You are not to consider that at all. Is that clear?" The jurors responded affirmatively that they

9

understood, and the State published the remainder of the interview.

Under these circumstances, the trial court did not abuse its discretion. "[A] new trial will not be granted unless it is clear that the trial court's curative instruction failed to eliminate the effect of the prejudicial comment [in contention]." *Turner v. State*, 299 Ga. 720, 723 (5) (791 SE2d 791) (2016). Here, the jurors indicated an understanding that they were not to consider the speculative statement in question, and there is no indication that it affected their consideration of the evidence before them. There was no abuse of the trial court's discretion, as neither Martin nor Byrd has shown that the grant of a mistrial was necessary to preserve the right to a fair trial. See *Jordan v. State*, 305 Ga. 12, 15 (2) (823 SE2d 336) (2019) (whether to grant a mistrial is committed to the discretion of the trial court, and the denial of a motion for mistrial will not be disturbed on appeal unless there is a showing that a mistrial was essential to preserve the defendant's right to a fair trial).

3. Martin contends that the trial court committed plain error by inadvertently charging the jury on the need for corroboration of

accomplice testimony prior to charging the single witness rule. Martin speculates that the order of the instructions confused the jury. This claim lacks merit.[4]

During its final charge, the trial court instructed the jury as follows:

> I further charge you . . . in assessing the credibility of witnesses you may consider any possible motive in testifying if shown. In that regard, you are authorized to consider any possible pending prosecutions, negotiated pleas, grants of immunity or leniency, or similar matters. You alone shall decide the believability of the witnesses. [A]n exception to this rule is made in the case of murder and aggravated assault when the witness is an accomplice. The testimony of an accomplice alone is not sufficient to warrant a conviction. Accomplice's testimony must be supported by other evidence of some type, and that evidence must be such as would lead to the inference of the guilt of the Accused independent of the testimony of the accomplice. It's not required though that supporting evidence be sufficient to warrant a conviction or that the testimony of an accomplice be supported in every material particular. Supporting evidence must be more than that a crime was actually committed by someone. It must be sufficient to connect the Accused with the criminal act. It

---

[4] Byrd raises a largely identical claim in the context of ineffective assistance of counsel, but that claim fails because, as we hold in this division, the trial court did not commit reversible error in the manner in which it gave instructions to the jury. See *Newman v. State*, 309 Ga. 171, 178 (2) (c) (844 SE2d 775) (2020) (failure to make a meritless objection does not provide a basis upon which to find ineffective assistance of counsel).

11

must be more than sufficient to merely cast upon the Accused a grave suspicion of guilt. Slight evidence, ladies and gentlemen, from any source that connects the Accused with the commission of the alleged crime and tends to show participation in it may be sufficient supporting evidence of the testimony of an accomplice. In order to convict, the evidence . . . when considered with all of the other evidence in the case must be sufficient to satisfy you beyond a reasonable doubt that the Accused is guilty.

I further charge you . . . the testimony of a single witness, if believed, is sufficient to establish a fact. Generally there is no legal requirement for corroboration of a witness provided you find the evidence to be sufficient.

With regard to these jury charges, Martin made no objections. Therefore, his claim is subject to plain error review on appeal. See *Guajardo v. State*, 290 Ga. 172 (4) (718 SE2d 292) (2011). The test for plain error is comprised of four prongs:

First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which

12

ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

(Citation, punctuation and emphasis omitted.) *State v. Kelly*, 290 Ga. 29, 33 (1) (718 SE2d 232) (2011).

Even if we assume without deciding that Martin could show that the first two prongs of the plain error test were satisfied, he would fail on the third prong, as the instructions given in this case did not affect his substantial rights. "In reviewing a challenge to the trial court's jury instructions, we view the charge as a whole to determine whether the jury was fully and fairly instructed on the law of the case." (Citations and punctuation omitted.) *Walker v. State*, 308 Ga. 33, 36 (2) (838 SE2d 792) (2020). Viewing the jury instructions given in this case in that manner, the trial court properly charged the jury that, in most circumstances, the testimony of a single witness is sufficient to establish a fact, but that accomplice testimony must be corroborated. These are proper concepts of law, irrespective of the order in which they were given. And, though it might have been preferable for the trial court to have

given the charges in a different order, the charge, as a whole, was complete, and the defendants have provided no evidence that the jury was either misled or confused. As such, there was no plain error.

4. Byrd contends that the trial court erred by ruling that a conversation Young and Cassell had with Gant days before the shooting was inadmissible hearsay. Specifically, Byrd contends that, a couple of days before Gant's shooting, Young and Cassell discussed a drug transaction with Gant. Byrd maintains that this conversation could have caused the jury to infer that Cassell, not Byrd, was the mastermind behind the ultimate plan to rob Gant. However, Byrd made no proffer of what Young's testimony would have been, and, as such, he has not provided the necessary component for us to consider his claim. See, e.g., *Morris v. State*, 303 Ga. 192, 194 (II) (811 SE2d 321) (2018) (defendant could not obtain a new trial based on his speculation about what a witness would have testified to). Moreover, even if Young's testimony could have been admissible for the reason he contends, Byrd has shown no harm, as ample other uncontested evidence showed that Byrd was an active participant in

14

the planning and robbery of Gant. See Division 1, supra.

5. Both Martin and Byrd raise claims that their respective trial counsel provided constitutionally ineffective assistance.

> To prevail on a claim of ineffective assistance of counsel, [a defendant] must prove both deficient performance and resulting prejudice. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, [a defendant] must show that his trial counsel performed in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, [a defendant] must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. We need not address both components of this test if [a defendant] has not proved one of them. See *Walker v. State*, 301 Ga. 482, 489 (801 SE2d 804) (2017).

*Watson v. State*, 303 Ga. 758, 761-762 (2) (d) (814 SE2d 396) (2018).

(a) Both Martin and Byrd contend their trial counsel were ineffective for failing to impeach Gibson's credibility with prior convictions. At the time of the shooting, Gibson had several pending misdemeanor charges, including marijuana possession, tampering with evidence, and shoplifting. These charges were resolved prior to trial — Gibson pled guilty to marijuana possession, the tampering

15

charge was merged, and an order of nolle prosequi was entered on the shoplifting charge. Neither Martin nor Byrd has presented any evidence that Gibson's plea deal was conditioned on providing testimony in their cases. Martin's trial counsel testified that he did not question Gibson about the misdemeanor convictions "because there was nothing about the plea that made [him] think that [Gibson] was trading up for his testimony." Furthermore, Gibson's trial counsel did not think such questioning was necessary because Gibson's testimony was a "gold mine"— in particular, that his testimony was "inconsistent and he was everywhere," and Gibson even "g[ot] up to flee from the witness stand in the middle of cross." Under these circumstances, neither Martin nor Byrd has shown his respective counsel performed deficiently. The decision not to confront Gibson with these prior convictions was strategic and reasonable. See *Redding v. State*, 307 Ga. 722 (1) (a) (838 SE2d 282) (2020) (no deficient performance where no evidence witness had a plea deal with the State and where trial counsel made tactical decision to attack credibility of witness on cross-examination in

16

other ways). Moreover, no showing of prejudice has been made, as Gibson's testimony was corroborated by testimony from other witnesses including Young and Cassell. See *Clark v. State*, 307 Ga. 537, 542 (2) (a) (837 SE2d 265) (2019).

(b) Separately, Byrd contends that his trial counsel provided constitutionally ineffective assistance by (i) failing to object after the trial court instructed the jury on the definition of aggravated assault four times; (ii) failing to object to an in-life photograph of Gant holding his son; and (iii) failing to impeach Gibson with inconsistent statements he had made.[5]

(i) With regard to trial counsel's decision not to object to the four separate instructions on aggravated assault, as Byrd recognizes, this Court recently ruled on a similar claim, holding: "Generally, mere repetition of a correct and applicable principle of law is not such error as requires reversal unless it takes color of an argumentative or opinionative utterance so as to tend to prejudice

---

[5] Byrd also contends that trial counsel provided constitutionally ineffective assistance by failing to object to the sequencing of the trial court's instructions. That contention is considered in footnote 4 of Division 3, supra.

17

the minds of the jury." (Citation and punctuation omitted.) *Wilkins v. State*, 308 Ga. 131, 140 (5) (839 SE2d 525) (2020). In this case, Byrd has not shown how the repetition of the correct definition of aggravated assault was "argumentative or opinionative" or how it could have prejudiced him in any way. Accordingly, Byrd has not shown ineffective assistance. See id.

(ii) Trial counsel did not perform deficiently by failing to object to an in-life photograph of Gant holding his son. Byrd argues that this photo was intended to invoke the jury's sympathy and inflame passions, and, as a result, trial counsel should have objected on the basis that the photograph was more prejudicial than probative. Here, however, Gant's son was also a victim in this case, and the jury was, therefore, well aware of Gant's son and aspects of their relationship. As such, Byrd has not shown that the mere inclusion of Gant's son in the photograph caused its prejudicial impact to substantially outweigh its probative value, as the photograph accurately represented the two victims of the shooting. See OCGA §§ 24-4-401 to 24-4-403. See also *Lofton v. State*, 309 Ga. 349, 355

18

(2) (b) (846 SE2d 57) (2020).

(iii) Finally, trial counsel did not perform deficiently by making the strategic decision not to cross-examine Gibson on potential inconsistent statements he had made.[6] At the hearing on Byrd's motion for new trial, trial counsel recalled that Gibson was intellectually disabled and that the jury "loved" and "felt sorry for him." Trial counsel chose not to cross-examine Gibson as to any inconsistent statements because he did not think there was "anything to be gained . . . by beating up on a sad witness." This was not unreasonable trial strategy, given Gibson's disability, his erratic behavior on the witness stand, and the inconsistencies in the testimony he did give at trial even without additional cross-examination. See *Butler v. State*, 273 Ga. 380, 385 (10) (b) (541 SE2d 653) (2001) ("[A] matter such as the cross-examination of a witness is most often grounded in matters of trial tactics and strategy and,

---

[6] For example, Gibson gave conflicting statements as to whether Martin or Byrd gave Cassell the gun. Evidence also indicated that, on the day of the shooting, Gibson stated that he had been drinking, but, at trial, he maintained that he had not.

in those instances, provides no basis for finding counsel's performance deficient.").[7]

*Judgments affirmed. Nahmias, P. J., and Boggs, Peterson, Bethel, Ellington, and McMillian, JJ., concur. Warren, J., not participating.*

DECIDED DECEMBER 21, 2020 — RECONSIDERATION DENIED JANUARY 11, 2021.
Murder. Chatham Superior Court. Before Judge Bass.
*David T. Lock*, for appellant (case no. S20A1134).
*Steven L. Sparger; Williams & Pine, Jonah L. Pine*, for appellant (case no. S20A1135).
*Meg E. Heap, District Attorney, Emily C. Puhala, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.

---

[7] As we hold that Byrd has not shown that his counsel performed deficiently, we need not consider his claim of cumulative error pursuant to *State v. Lane*, 308 Ga. 10 (1) (838 SE2d 808) (2020).